United States District Court
Southern District of Texas

**ENTERED**

September 30, 2021

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LASTERSTEEN TONY THOMPSON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-2548 |
| | § | |
| MATTHEW BRUNO, *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

**MEMORANDUM OPINION AND ORDER**

State inmate Lastersteen Tony Thompson, a Harris County pretrial detainee at the time of filing, filed this 42 U.S.C. § 1983 lawsuit against Harris County Sheriff Ed Gonzalez and Harris County Sheriff's Office ("HCSO") employee Matthew Bruno. He seeks monetary damages for Bruno's alleged use of excessive force in violation of his Fourteenth Amendment rights.[1] Defendants filed a motion for summary judgment (Docket Entry No. 98), to which plaintiff filed a response in opposition (Docket Entry No. 108).

Having considered the motion, the response, the exhibits, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment and **DISMISSES** this lawsuit for the reasons shown below.

---

[1]Plaintiff identified Bruno as an "unknown officer" in his complaint. He subsequently filed a second lawsuit, identifying Bruno by name. *Thompson v. Bruno*, C.A. No. H-18-2665 (S.D. Tex.). The two lawsuits were consolidated under the instant case number. Accordingly, the two complaints (Docket Entries No. 1 in each case number) have been construed together as a single complaint (the "Complaint").

# I. BACKGROUND AND CLAIMS

## A.    The Complaint

Plaintiff alleges in his Complaint that, on July 6, 2018, while in pretrial detention at the Harris County Jail, he was assaulted and injured by detention officer Bruno during a use of force. Plaintiff states that he has mental health issues,[2] was on medication at the time, and was having a "mental health crisis" following two earlier altercations that day with another inmate and a detention officer. He states that Bruno ignored his requests for a supervisor or mental health officer. Plaintiff claims that Bruno grabbed his shirt and ordered him to "turn around and face the motherf**king wall a**hole," ignored plaintiff's statement of being a "MHMRA inmate having a crisis," and said "I don't give a f**k, lay your black a** down," and slammed plaintiff to the floor. Plaintiff reports he sustained a head concussion and back and shoulder injuries as a result of being thrown to the floor. He was examined by jail medical staff and given anti-inflammatory and pain medications.

Plaintiff asserts that he filed a grievance against Bruno the day of the incident, and that Bruno retaliated two weeks later by filing disciplinary charges against him.

Plaintiff seeks monetary damages against Bruno in his individual capacity. No claims are pleaded against Gonzalez.

---

[2]Plaintiff's medical records reveal diagnoses of antisocial personality disorder, multiple substance abuse, unspecified bipolar disorders, and post-traumatic stress disorder. (Docket Entry No. 98-3, p. 29.)

B.    Defendants' Motion for Summary Judgment

Defendants argue that Bruno's use of force was objectively reasonable and necessary, as plaintiff had been physically resisting Bruno's efforts to place hand restraints on plaintiff, and had held on to Bruno in an attempt to avoid being brought to the floor. Bruno asserts entitlement to qualified immunity. Defendants further seek dismissal of Gonzalez as a party, as plaintiff pleaded no factual allegations raising a claim for relief against him.

Bruno submitted an affidavit in support of the motion for summary judgment, wherein he testified in relevant part as follows:

> I am licensed as a detention officer by the State of Texas. I have served as a detention officer for three years and five months. I am employed by the Harris County Sheriff's Office, where I have been employed since April 5, 2017. I am assigned to the Harris County Jail. On July 6, 2018, I was assigned to Medical Holdover, which is located on the first floor of the Harris County Jail located at 1200 Baker Street, Houston, Texas 77002. I work First Watch, which is 6:00 AM to 2:00 PM. At approximately 10:55 [AM] on that July 6, 2018, I observed an unidentified inmate and Detention Officer A. Cantu yelling at each other. I came to assist with the situation to de-escalate the inmate from becoming violent; I told Officer Cantu to leave the area. The unidentified inmate was later identified as Tony Thompson (also known as Lastersteen Thompson) ("Inmate Thompson").

> I then observed Inmate Thompson pacing back and forth in an aggressive motion in an attempt to see if anyone was down the hallway; he stated: "I should've got that N. . . ." I ordered Inmate Thompson to move away from the doorway. Inmate Thompson returned to pacing back and forth. While waiting for an elevator, Inmate Thompson was displaying erratic behavior from the prior incident which I had attempted to de-escalate by talking to Inmate Thompson, but was unsuccessful. At this point, I decided to handcuff Inmate Thompson because I was concerned for my safety.

> I approached Inmate Thompson and gave him verbal commands to turn around and place his hands behind his back. Inmate Thompson replied, "You are not

3

handcuffing me," as I attempted to take hold of Inmate Thompson's left hand to place the handcuff. I was not able to place the handcuffs on Inmate Thompson because he pulled away. I told Inmate Thompson not to pull away from me. Inmate Thompson stated, "You are not putting them on me." He then gabbed me by my shoulder area. I took hold of Inmate Thompson's shirt and placed him on the wall, giving him verbal commands to stop resisting and turn around.

I attempted to turn Inmate Thompson around to handcuff him, but again was unsuccessful, due to his physical resistance. As I was trying to turn Inmate Thompson around to attempt to handcuff him again, he managed to get off the wall. I placed Inmate Thompson against elevator door #3 without impact. I once again attempted to turn Inmate Thompson around to put handcuffs on him. Inmate Thompson continued to physically resist my attempts to handcuff him.

Due to Inmate Thompson's physical resistance, I placed my hands on Inmate Thompson's shoulders, twisting [him] to the right and placed him on the ground. I gave Inmate Thompson verbal commands to turn on his stomach and place his hands behind his back. Inmate Thompson replied, "you are not handcuffing me" as I was attempting to turn him onto his stomach so I could handcuff him. Both Detention Officer J. Muellei [*sic*] and Detention Officer A. Luna assisted me in handcuffing Inmate Thompson. I then took hold of Inmate Thompson's left arm with an open hand and placed it in the middle of Inmate Thompson's back. Detention Officer Luna took hold of Inmate Thompson's right arm and placed his hand in the middle of his back.

Inmate Thompson was handcuffed without any further incident. We then assisted [him] to his feet. Inmate Thompson stated, "Wait till I get out, I'm going to f***ing kill you I promise you that, I'm going to kill you." Officer Luna escorted Inmate Thompson upstairs.

At no time did I witness any officer deliver any strikes to Inmate Thompson. I did not deliver any strikes to Inmate Thompson during this incident. The only force I used was to take him to the ground in view of his physical resistance to being handcuffed. Inmate Thompson did not have any visible injuries at this time. I was not injured. I advised Inmate Thompson that he was being written up for Infraction "1106 Resisting Restraint" of the Harris County Sheriff's Office Inmate Handbook. I offered him the opportunity to write a statement and he declined. I issued Inmate Thompson a confirmation

of service with respect to the filing of the in-house charge. Inmate Thompson was taken to Medical. I advised Classification Detention Officer D. Pagan and Sergeant D. Hang of this incident and I understand that my use of force against Inmate Thompson was reviewed by the Harris County Sheriff's Office Internal Affairs Division and found to be reasonable.

At all times relevant to this incident, I was within the scope of my employment as a detention officer. I was performing a discretionary duty with respect to my attempt to handcuff Inmate Thompson and use of force against him as a result of his resistance. I acted at all times in good faith in my encounter with Inmate Thompson.

(Docket Entry No. 98, Exhibit A.)

Plaintiff filed a grievance against Bruno following the incident, stating *verbatim* as

follows:

On the date of 7-6-2018 - at about 11:00 a.m. by the 1st Floor elevator I was physical assaulted by officer when I recently request for the present of a Sgt on duty this uneasier use of force cause serious injuries to my shoulder and back which resulted me to be place on pain medication. I would like to know what action will take place regarding this officer behavior.

(Docket Entry No. 98-3, p. 22.) The Internal Affairs Division of the Office of Inspector

General investigated the incident, and issued the following report:

On Sunday, July 1 [*sic*], 2018, Inmate Lastersteen Thompson [SPN #] submitted an Inmate Complaint Form and alleged he was physically assaulted causing serious pain to his shoulder and back.

According to Detention Command – Inmate Offense Report 2018-35332, on July 6, 2018, at approximately 11:00 A.M., Inmate Thompson initiated a verbal altercation with another inmate and became physically hostile when he squared his shoulders and raised two closed fists toward the inmate. Detention Officer R. Romero used open hand control to create distance between the inmates and was ordered to wait in the elevator lobby. When Inmate Thompson attempted to exit the elevator lobby and approach the other inmate, Detention Officer A. Cantu pushed him back into the elevator lobby.

5

Detention Officer M. Bruno arrived to de-escalate the situation by telling Detention Officer Cantu to leave the area, and assumed responsibility for Inmate Thompson. While in the elevator lobby, Inmate Thompson continued to display erratic behavior. Detention Officer Bruno ordered Inmate Thompson to turn around and place his hands behind his back and attempted to handcuff Inmate Thompson for his (Bruno) safety. Inmate Thompson stated, "You are not handcuffing me," and pulled away from Detention Officer Bruno multiple times. Detention Officer Bruno ordered Inmate Thompson to stop resisting, but Inmate Thompson did not comply. Detention Officer Bruno took hold of Inmate Thompson's shoulders and took him to the ground. Detention Officer Bruno ordered Inmate Thompson to roll over on his stomach, to which he continued to resist. Detention Officers Muller [*sic*] and Luna assisted Detention Officer Bruno turn Inmate Thompson on his stomach and handcuffed him. Inmate Thompson was written up for infraction 1106 – Resisting Restraint.

Use of Force 2018–00447 and Significant Event Bulletin 2018–07–06–09208 were generated in reference to this incident by Sergeant D. Hang. The case was reviewed by Detention Officer J. Lasater, with the Internal Affairs Division – Use of Force Section, who determined the use of force as "reasonable."

According to videos, on July 6, 2018, at approximately 10:58 A.M., Inmate Thompson was in the main hallway outside Floor Control Center on the first floor of the 1200 Baker Street Jail. Detention Officer Romero escorted another inmate down the hallway behind Inmate Thompson. Inmate Thompson turned around toward the other inmate, squared his shoulders and raised his fists toward him. Detention Officer Romero pushed Inmate Thompson back and away from the other inmate. Inmate Thompson continued to look back at the [*sic*] Detention Officer Romero and the inmate as he walked toward the elevator lobby. Detention Officer Cantu responded and followed Inmate Thompson to the elevator lobby. As Inmate Thompson attempted to leave the elevator lobby, Detention Officer Cantu pushed him back inside. Inmate Thompson stepped up to Detention Officer Cantu and clenched his fists. Detention Officer Cantu attempted to take hold of Inmate Thompson's left arm, but he pulled it away. Detention Officer Bruno responded to the area and assumed the escort of Inmate Thompson and Detention Officer Cantu walked back to the 1200 clinic. Inmate Thompson, again, attempted to exit the elevator lobby, but was stopped by Detention Officer Bruno. Inmate Thompson paced around the elevator lobby and

appeared to be emotionally upset.  At approximately 10:56 A.M., Detention Officer Bruno approached Inmate Thompson, pulled out his handcuffs, and attempted to take hold of his right arm.  Inmate Thompson pulled his arm away from Detention Officer Bruno, several times, and Detention Officer Bruno took him to the floor.  Detention Officer Bruno was assisted by two detention officers and Inmate Thompson was handcuffed.  The video accurately reflected what was documented in the report.

According to medical records, on July 6, 2018, Inmate Thompson was evaluated by medical staff and complained of shoulder and back pain after an altercation. Inmate Thompson had a documented history of degenerative back disease, was prescribed medication for pain, and a follow-up with the Triage nurse after two days.  No serious injuries were reported in the medical records.

After review of the incident, it is my determination that all force used toward Inmate Thompson was reasonable and all information submitted was complete and accurate.  No State Laws or Harris County Sheriff's Office policies were violated and therefore I respectfully request this case be closed administratively.

Signed by Lauren Cooper, Deputy, Office of Inspector General, Internal Affairs Division.

(Docket Entry No. 98-3, pp. 4–5.)

HCSO Sergeant Hoang also investigated the use of force, and reported as follows:

On Friday, July 6, 2018, I, Sergeant D. Hoang was assigned to Admin Separation [*sic*] /1200 Medical on 1st watch at the Harris County Sheriff's Detention Facility located at 1200 Baker Street, Houston, Texas 77002. At approximately 1115 hours, Detention Officer M. Bruno (EIN #) advised me that he had to physically take inmate L. Thompson (SPN #) to the ground due to inmate Thompson refusing (several times) to be handcuff [*sic*] (Detention Officer Bruno advised this incident occurred at approximately 1055 hours on this date). Detention Officer Bruno advised [*sic*] after several attempts to place handcuffs on inmate Thompson and inmate Thompson physically refusing (by pulling his arms away), Detention Officer Bruno advised he grabbed onto inmate Thompson, then he twisted his body (facing away) away from inmate Thompson, and then placing his left leg in front of inmate Thompson to trip inmate Thompson down to the ground. The video showed the same thing.

7

When inmate Thompson was on the ground, Detention Officer Bruno got on top of inmate Thompson and was in the processing of placing handcuffs on him when Detention Officer A. Luna (EIN #) and Detention Officer J. Mueller (EIN #) came and assisted Detention Officer Bruno on securing the handcuffs on inmate Thompson.  Lt. R. Berry was notified of this incident.

*    *    *    *

Upon review of this Use of Force Packet, I found the force used reasonable based on the information received at the time of review. No State Laws or Harris County Sheriff's Office polices were violated.

(Docket Entry No. 98-3, p. 8.)   Detention Officer Cantu provided the following statement

for the Detention Command – Inmate Offense Report:

On Friday, July 06, 2018, I, Detention Officer A. Cantu (EIN #), of Medical Security, was assigned to Holdover on the 1st floor of the Harris County Jail Facility located on 1200 Baker Street Houston, Texas. At approximately 10:50 hours, an inmate identified as Inmate Thompson, Tony (SPN #) left the clinic to go back to his housing after getting a pair of glasses.  Another inmate being escorted by a detention officer was leaving at the same time Inmate Thompson was leaving.  Inmate Thompson began to argue with the inmate who was being escorted.  The inmate being escorted was handcuffed and leg ironed.  Inmate Thompson continued to walk aggressively towards the inmate.  The Detention Officer escorting the handcuffed inmate yelled for rovers.  I walked up to Inmate Thompson and ordered him to go to the elevator lobby and wait for the elevator to come down.  Inmate Thompson was waiting in the elevator lobby, however, I observed Inmate Thompson peeking out of the elevator lobby to see where the other inmate was at.  I walked towards the elevator lobby and observed Inmate Thompson still attempting to peek out of the elevator lobby to see where the inmate was at.  Inmate Thompson attempted to come out of the elevator lobby to walk towards the inmate being escorted.  I raised my hand and pressed it against Inmate Thompson's chest and ordered him to go back to the elevator lobby to wait for the elevator to come and get him.  Detention Officer M. Bruno (EIN #) came up to me and stated for me to go back to the holdover and he would watch Inmate Thompson.  I walked back to the holdover and let Detention Officer Bruno take over to watch Inmate Thompson to make sure he got on the elevator.

8

(Docket Entry No. 98-3, p. 25.)  Detention Officer Luna also provided a statement:

> On Saturday July 6, 2018, I, Detention Officer A. Luna (EIN #), was assigned to the sixth floor B-Pod, of the 1200 Baker Street Detention Facility, on 1st shift.  My partner for the day was Detention Officer D. Tshimanga (EIN #). At approximately 1105 I had taken Inmate Ingram, Ray David (SPN #) identified by armband T-Card from 6B2 down to the clinic to receive psychiatric medication.  As I began to exit the clinic area I heard commotion near the elevator lobby area[.]  I ran to the elevator lobby [and] observed Detention Officer Bruno dealing with a non-compliant Inmate on the floor. I approached the Inmate on the floor[,] gave the Inmate a direct order to place his hands behind his back the inmate was still non-compliant[.]  I grabbed the inmate[']s right arm to place behind his back [and] assisted Detention Officer Bruno with handcuffing.  Once the inmate was handcuffed I informed the Inmate he will be lifted up from the floor to his feet.  The Inmate was then taken back to the third floor where he was housed.

(Docket Entry No. 98-3, p. 25.)  Additionally, Detention Officer J. Mueller provided the

following statement:

> On Friday, July 6, 2018, I, Detention Officer J. Mueller (EIN #), was assigned to the Fourth Floor as a Rover at Harris County Sheriff's Office 1200 Baker Street Jail on Day Watch.  At approximately 10:55 hours, I and Detention Officer A. Luna (EIN #) where [sic] escorting inmates to are [sic] designated floors when we heard a commotion in the elevator lobby.  D.O. Luna and I took off running and when we entered the elevator lobby D.O. M. Bruno (EIN #) had Inmate Thompson, Tony (SPN #) lying on his back.  D.O. Luna and I ran over and assisted D.O. Bruno turn the inmate onto his stomach.  D.O. Luna and D.O. Bruno began placing handcuffs on the inmate.  I grabbed the inmate by his legs until he was restrained by D.O. Luna and D.O. Bruno.

(Docket Entry No. 98-3, p. 25.)

Defendants submitted plaintiff's medical records in support of their motion.  The

records show that plaintiff was seen in clinic following the incident, and that he complained

of "right shoulder pain related to an altercation," and that he "ambulated to the clinic with

9

steady gait, resp[irations] even and unlaboard [*sic*]."  (Docket Entry No. 98-3, p. 27.)  In charting plaintiff's history of the present illness, medical providers reported that plaintiff was "sent down to clinic with security for altercation.  He states he has left shoulder pain and low back pain ([history] of chronic low back pain).  He has no visible signs of acute trauma." Plaintiff informed medical staff that he did not think anything was broken, and that he did not want x-rays.  He requested "something for pain."  Plaintiff made no mention of loss of consciousness, nausea or vomiting, dizziness, or headache.  *Id.*, p. 28.  X-rays of plaintiff's back and spine revealed no abnormalities beyond degenerative changes.  *Id.*, p. 29.  He was prescribed Tramadol for pain and Flexeril for inflamation.  *Id.*

Bruno argues he is entitled to qualified immunity because his use of force was objectively reasonable under the circumstances, and that he did not violate plaintiff's constitutional rights.

C.      Plaintiff's Response

In his response to the motion for summary judgment (Docket Entry No. 108) and affidavit (Docket Entry No. 109), plaintiff expands and modifies the allegations he made in his Complaint.  He claims in his response and affidavit that a few minutes before the incident, he had been involved in a verbal altercation with another jail detainee in a waiting area.  Jail officers separated them and moved plaintiff towards the jail elevator lobby for transport back to his cell.  Bruno arrived at the lobby to complete the transport and told the other officers to return to their assigned stations.  Contrary to the allegations in his

10

Complaint, plaintiff alleges in his response and affidavit that Bruno told the other officers he was "going to f\*\*k him up" and "d[i]dn't need no one's help." *Id.*, p. 4. Upset by Bruno's words and fearing for his safety, plaintiff began pacing back and forth waiting for the elevator. Plaintiff does not deny that Bruno attempted to place hand restraints on him, or that he physically resisted Bruno's efforts. Plaintiff claims that Bruno grabbed his hand and shirt and ordered him to face the wall, saying "I'm gonna f\*\*k you up now." Plaintiff acknowledges that he held on to Bruno's shoulder, but claims it was to avoid being pushed to the floor. (Docket Entry No. 109, p. 3.) He states that Bruno then turned him and "with great force slammed me to [the] cement floor." (Docket Entry No. 108, p. 4.) Plaintiff denies telling Bruno, "You are not handcuffing me," and asserts that he told Bruno, "You need to notify your duty SGT and mental health of a crisis." *Id.* Plaintiff states that he "suffered permanent back pain, and later brain damage." (Docket Entry No. 109, p. 3.)

Medical records submitted by plaintiff show that he was examined by medical staff following the incident and was treated for back and shoulder pain. Several months later, he complained of headaches and was treated for hypertension. (Docket Entry No. 108, Exhibit A.) Although he was provided physical therapy for his lumbar spine in March 2019, the medical record does not indicate that the physical therapy was related to the incident as opposed to plaintiff's chronic degenerative spinal condition. The medical records evince no diagnosis of a concussion or brain damage.

11

## II.  ANALYSIS

A.    Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014); FED. R. CIV. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Brackeen v. Haaland*, 994 F.3d 249, 290 (5th Cir. 2021) (en banc).  The court is to view "all the facts and evidence in the light most favorable to the non-movant." *Ortega Garcia v. United States*, 986 F.3d 513, 524 (5th Cir. 2021). However, "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012).

Procedurally, the party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (alterations in original, quotation marks and citation omitted). When the nonmoving party will bear the burden of proof at trial, the moving party may satisfy this responsibility by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Labs*,

12

919 F.2d 301, 303 (5th Cir. 1990); *see also Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544–45 (5th Cir. 2005).

If the moving party succeeds, "the onus shifts to the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *LHC Grp.*, 773 F.3d at 694 (internal quotation marks and citation omitted).

B.      Defendant Bruno – Use of Excessive Force

Plaintiff claims that Bruno violated his Fourteenth Amendment due process rights, citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (holding that the Due Process Clause forbids holding pretrial detainees in conditions that "amount to punishment").

To prevail on his Fourteenth Amendment claim against Bruno, plaintiff must show that Bruno purposely or knowingly used force against him that was objectively unreasonable. *See Kingsley v. Henrickson*, 576 U.S. 389, 398 (2015). Objective reasonableness turns on the facts and circumstances of each particular case, viewed from the perspective of a reasonable officer facing the same circumstances. *Id.* As stated by the Supreme Court in *Kingsley*,

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* at 397.

13

The probative summary judgment evidence in this case shows that plaintiff had verbal altercations with another prisoner and a detention officer the morning of the event. Defendant Bruno stepped in to de-escalate the confrontation between plaintiff and the detention officer, and took responsibility for transporting plaintiff to his housing. Plaintiff was ordered to remain in the elevator lobby for the elevator to arrive, but he attempted to walk away and repeatedly looked around for other inmates and officers. For his own safety as the transporting officer, Bruno ordered plaintiff to submit to hand restraints. Plaintiff refused to comply with the order, and actively resisted Bruno's attempts to apply the restraints. Plaintiff does not controvert these facts and allegations, or does he dispute that other officers were brought in to help subdue and restrain him. Indeed, plaintiff admits in his affidavit response that he held on to Bruno's shoulder to avoid being pushed to the floor (Docket Entry No. 109, p. 3). Plaintiff physically resisted Bruno's orders and efforts to apply hand restraints, and Bruno maneuvered him to the floor. Bruno and the other officers were then able to apply hand restraints to plaintiff and transport him to his cell.

Plaintiff does not establish that Bruno used objectively unreasonable force under the facts and circumstances of this case, and no Fourteenth Amendment violation is shown. Defendant Bruno is entitled to summary judgment dismissal of plaintiff's claim against him for use of excessive force, and the claims is **DISMISSED WITH PREJUDICE.**

14

C.     Defendant Bruno – Qualified Immunity

Bruno claims entitlement to the defense of qualified immunity. Qualified immunity shields officers from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It provides officers "breathing room to make reasonable but mistaken judgments," and "all but the plainly incompetent or those who knowingly violate the law" are protected. *Stanton v. Sims*, 571 U.S. 3, 6 (2013); *Pratt v. Harris County*, 822 F.3d 174, 181 (5th Cir. 2016). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (internal citations and quotation marks omitted). Qualified immunity "represents the norm, and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020); *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) (explaining that courts "must think twice before denying qualified immunity").

Once raised, a qualified immunity defense alters the usual summary judgment burden of proof. *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020); *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). When an officer invokes qualified immunity at the summary judgment stage, courts ask two questions: (1) whether the evidence viewed in the light most favorable to the plaintiff shows that the officer violated a constitutional right, and (2) whether the unlawfulness of his conduct was clearly established at the time. *District of Columbia v.*

15

*Wesby*, ____U.S. ___, 138 S. Ct. 577, 589 (2018).  A plaintiff bears the burden to negate the defense of qualified immunity.  *See Bourne v. Gunnels*, 921 F.3d 484, 490 (5th Cir. 2019).

The "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. *Flores v. City of Palacios*, 381 F.3d 391, 397 (5th Cir. 2004).  It requires consideration of the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest. *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016). A court may address the two prongs of the qualified immunity analysis in any sequence, depending on the circumstances of the particular case at hand. *Pearson*, 555 U.S. at 236; *Heaney v. Roberts*, 846 F.3d 795, 801 (5th Cir. 2017).

The Court determined above that Bruno's use of force was not objectively unreasonable and did not constitute a violation of plaintiff's Fourteenth Amendment protections. Consequently, Bruno is entitled to qualified immunity. Although plaintiff avers for the first time in his response that Bruno threatened to "f**k him up," this allegation does not change the Court's analysis or determination. The "objectively reasonable" standard is determined in light of the facts and circumstances confronting the officer, without regard to his underlying subjective intent or motivation. *Flores*, at 397.

16

Here, plaintiff had been involved in two altercations immediately prior to his incident with Bruno. For his own safety, and in light of plaintiff's demeanor and behavior, Bruno ordered plaintiff to submit to hand restraints, but plaintiff actively resisted. At one point, plaintiff held on to Bruno to thwart Bruno's actions. Bruno took steps to subdue plaintiff and placed him on the floor so that Bruno and other officers could apply the restraints. Plaintiff's medical records show that he complained of back and shoulder pain following the incident, denied any loss of consciousness or headache, and was provided pain relief. X-rays taken of plaintiff's back and spine revealed chronic degenerative spinal deformities, but no fractures or acute injuries. Although plaintiff claims he suffered a concussion and "brain damage" from the incident, his medical records do not support his claim.

Bruno's actions were objectively reasonable in light of the facts and circumstances confronting him. Bruno is entitled to qualified immunity, and plaintiff's claims against him for use of excessive force are **DISMISSED WITH PREJUDICE**, premised on qualified immunity.

D.    Defendant Bruno – Retaliation

Plaintiff asserts that, after he filed a grievance against Bruno for the incident, Bruno retaliated by bringing disciplinary charges against plaintiff for resisting restraints. Plaintiff contends that this chronology of events constitutes proof of retaliation.

It is well established that prison officials may not retaliate against prisoners for exercising their constitutional rights, including their right to file administrative grievances.

*Petzold v. Rostollan*, 946 F.3d 242, 252 (5th Cir. 2019).  But to succeed on a retaliation claim, the prisoner must overcome a "significant burden." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).  He must demonstrate (1) a specific constitutional right, (2) defendant's intent to retaliate against the prisoner for his exercise of that right, (3) a retaliatory adverse act, and (4) causation. *See Bibbs v. Early*, 541 F.3d 267, 270 (5th Cir. 2008).  The prisoner must provide direct evidence of intent and causation, or at least establish a "chronology of events from which retaliation may be plausibly inferred." *Woods*, 60 F.3d at 1166.

The records submitted by defendants as exhibits to their motion for summary judgment show that the chronology of events alleged by plaintiff is incorrect.  The incident made the basis of this lawsuit occurred on July 6, 2018.  Plaintiff's grievance against Bruno (Grievance # 24069) was received by HCSO officials on July 9, 2018.  (Docket Entry No. 98-3, pp. 20, 21, 22.)  However, HCSO Administrative Investigation Request documents indicate that, "Inmate Offense Report #2018-35332 for #1106 Resisting Restraint was generated on Inmate Thompson on July 6, 2018." *Id.*, pp. 17–19, 35.  Thus, Bruno's charges against plaintiff for resisting restraints were made prior to HCSO officials' receipt of his grievance against Bruno.  At most, the grievance against Bruno and the disciplinary charges against plaintiff were filed on the same day, and no chronology of retaliation is shown. *See DeMarco v. Davis*, 914 F.3d 383, 388 (5th Cir. 2019).  Plaintiff fails to demonstrate intent and causation for purposes of establishing retaliation.

18

The record refutes plaintiff's claim that Bruno retaliated against him by filing disciplinary charges for resisting restraints. Plaintiff fails to establish retaliation, and the claim is **DISMISSED WITH PREJUDICE**.

E.    Defendant Gonzalez

As noted earlier, plaintiff pleaded no factual allegations in his Complaint raising a claim for relief against Harris County Sheriff Ed Gonzalez. In his response to the motion for summary judgment, plaintiff states that, "Sheriff Ed Gonzalez was not involved in the incident[,] other than the fact that he failed to adequately train his subordinates." (Docket Entry No. 108, p. 3.) Plaintiff's Complaint did not raise a claim against Gonzalez for failure to train, nor did plaintiff present probative summary judgment evidence supporting such claim. Plaintiff's claim against Gonzalez is **DISMISSED WITHOUT PREJUDICE**.

## III.   CONCLUSION

Defendants' motion for summary judgment (Docket Entry No. 98) is **GRANTED**. Plaintiff's claims against defendant Matthew Bruno are **DISMISSED WITH PREJUDICE**. Plaintiff's claims against defendant Harris County Sheriff Ed Gonzalez are **DISMISSED WITHOUT PREJUDICE**. Any and all pending motions are **DENIED AS MOOT**.

Signed at Houston, Texas, on this the _30th_ day of September, 2021.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE